**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

M. DENISE TOLLIVER,

Plaintiff,

v.

RUSHMORE LOAN MANAGEMENT SERVICES, LLC,

Defendant.

Civil Action No. 21-1768-RGA

TRIAL OPINION

Angelica Marcine Mamani, HUDSON JONES JAYWORK & FISHER LLC, Dover, DE,

Attorney for Plaintiff.

Christina J. Pross, MARINOSCI LAW GROUP, Newark, DE; Sammy Hooda, MARINOSCI LAW GROUP, Addison, TX,

Attorneys for Defendant.

September 25, 2026

**ANDREWS, U.S. DISTRICT JUDGE:**

Plaintiff M. Denise Tolliver sued Defendant Rushmore Loan Management Services, LLC ("Rushmore") under the Fair Credit Reporting Act ("FCRA").[1] (D.I. 35). I held a one-day bench trial on April 29, 2026. For the following reasons, I find that (1) Rushmore has violated the reasonable investigation requirement of 15 U.S.C. § 1681s-2(b), and (2) Tolliver has not demonstrated that she is entitled to any of her requested relief.

## I. BACKGROUND

In 2008, Tolliver executed a mortgage on a residential property in Wilmington, Delaware. Rushmore took over as the loan servicer on Tolliver's mortgage in May of 2020; prior to Rushmore's involvement, Wells Fargo Bank had initiated a foreclosure action. (D.I. 128 at 2). In July of 2020, Rushmore offered Tolliver a Trial Period Plan ("TPP") as a prerequisite to entering a permanent loan modification agreement. Tolliver made six payments during this time frame; as I ruled on summary judgment, these payments did not need to be reported to credit reporting agencies ("CRAs"). (D.I. 111 at 1–2). On February 17, 2021, Rushmore offered Tolliver a permanent loan modification agreement (the "Modification Agreement"). Tolliver signed the Modification Agreement on August 13, 2021. She sent the signed Modification Agreement to Rushmore on September 8, 2021, with a check covering the overdue amount from the time the TPP ended through September of 2021. On September 21, 2021, Tolliver submitted a credit report dispute with Transunion stating that Rushmore had reported incorrect information. The dispute form (the "ACDV form") generated by Transunion specifically identified the account status, payment rating, and account history as in dispute. On September 23, 2021, Rushmore countersigned the Modification Agreement. Rushmore returned the ACDV form to Transunion

[1] Plaintiff asserted several other claims (*see* D.I. 35), which I dismissed prior to trial. (D.I. 59).

on September 30; the report did not include any substantive changes to her payment history. Rushmore's internal system began reporting Tolliver's account as current on October 7, 2021; Rushmore issued updated account information to the CRAs shortly after.

The only liability issue left in this case is whether Rushmore conducted a "reasonable" investigation as required by the FCRA.[2]

## II. FCRA CLAIM

### A. Legal Standard

Under the FCRA, a consumer may submit a dispute to a CRA regarding the completeness or accuracy of information contained in his or her CRA file. 15 U.S.C. § 1681i(a). A dispute may regard information supplied to a CRA by third-party furnishers of information. *SimmsParris v. Countywide Fin. Corp.*, 652 F.3d 355, 359 (3d Cir. 2011). After a CRA receives a dispute, it must notify any furnisher of information that is relevant to the dispute. *Id.*; 15 U.S.C. § 1681i(a)(2). Upon receiving notice from the CRA, the furnisher of the information must:

> (A) conduct an investigation with respect to the disputed information;
> (B) review all relevant information provided by the consumer reporting agency pursuant to section 611(a)(2) [15 USCS § 1681i(a)(2)];
> (C) report the results of the investigation to the consumer reporting agency;
> (D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and
> (E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly—
> (i) modify that item of information;
> (ii) delete that item of information; or

[2] Plaintiff was pro se during much of the case, although represented by counsel at trial. Plaintiff kept good records in her capacity as a consumer, but she completed very little discovery. Thus, some of the documentary evidence that I might have expected to see, such as Defendant's internal records relating to Plaintiff's account, was never produced and therefore was not introduced at trial.

(iii) permanently block the reporting of that item of information.

15 U.S.C. § 1681s-2(b)(1). "The duties that are placed on furnishers of information by this subsection are implicated only '[a]fter receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency.'" *SimmsParris*, 652 F.3d at 358 (quoting 15 U.S.C. § 1681s-2(b)(1)).

The FCRA provides a private cause of action for negligent or willful violations of 15 U.S.C. § 1681s-2(b) by furnishers of information. *Seamans v. Temple Univ.*, 744 F.3d 853, 867–68 (3d Cir. 2014); *SimmsParris*, 652 F.3d at 358. Courts in the Third Circuit have generally required a plaintiff to prove that: "(1) she sent notice of disputed information to a consumer reporting agency, (2) the consumer reporting agency then notified the defendant furnisher of the dispute, and (3) the furnisher failed to investigate and modify the inaccurate information." *Parker v. Nationstar Mortg. LLC*, 2015 WL 6472223, at *7 (W.D. Pa. Oct. 27, 2015); *see Harris v. Pa. Higher Educ. Assistance Agency/Am. Educ. Servs.*, 2016 WL 3473347 at *6 (E.D. Pa. June 24, 2016); *Armour v. Sallie Mae, Inc.*, 2010 WL 3724524, at *2 (D.N.J. Sept. 14, 2010). Within the third element, "(1) the plaintiff must make a prima facie showing that the furnisher provided incomplete or inaccurate information, and (2) the plaintiff must show that the incompleteness or inaccuracy was the product of an unreasonable investigation." *Ritz v. Equifax Info. Servs., LLC*, 2025 WL 1303945, at *3 (3d Cir. May 6, 2025) (cleaned up); *see Calloway v. Green Tree Servicing, LLC*, 607 F. Supp. 2d 669, 675 (D. Del. 2009). Information qualifies as incomplete or inaccurate if it is "factually incorrect [or] technically correct [but] through omission, creates a materially misleading impression." *Seamans*, 744 F.3d at 865 (internal citation omitted and cleaned up). A "reasonable" investigation is a factual determination based on the investigational

procedure used, the balance of inaccuracy with the costs of investigating, and the content of the inaccuracy notice. *Id.* at 864–65.

The damages to which a plaintiff is entitled depends on whether the furnisher negligently or willfully violated 15 U.S.C. § 1681s-2(b). *Seamans*, 744 F.3d at 867–68. "Sections 1681n and 1681o of Title 15 respectively . . . allow recovery for actual damages and attorneys fees and costs, as well as punitive damages in the case of willful noncompliance." *Philbin v. Trans Union Corp.*, 101 F.3d 957, 962 (3d Cir. 1996). In a finding of negligent violation, a plaintiff is entitled to:

> an amount equal to the sum of—
> (1) any actual damages sustained by the consumer as a result of the failure; and
> (2) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

15 U.S.C. § 1681o(a). "Liability for willful violations will lie not only in the case of knowing violations of the statute but also if a defendant acts with reckless disregard of the statute's terms." *Seamans*, 744 F.3d at 868 (internal quotation omitted). After finding the violation was willful, a plaintiff is entitled to:

> an amount equal to the sum of—
> (1)(A) any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000; or
> (B) in the case of liability of a natural person for obtaining a consumer report under false pretenses or knowingly without a permissible purpose, actual damages sustained by the consumer as a result of the failure or $1,000, whichever is greater;
> (2) such amount of punitive damages as the court may allow; and
> (3) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

15 U.S.C. § 1681n(a).

**B. Findings of Fact**

1. There were two testifying witnesses, Plaintiff M. Denise Tolliver (Tr. 5:6–58:22, 136:15–137:11)[3] and Rushmore's Principal Litigation Ambassador Jason George (Tr. 59:16–136:7). There was very little overlap in the testimony of the two witnesses. I thought they were both credible.

2. Rushmore began servicing Tolliver's loan in May of 2020. (Tr. 6:6–9; DTX 5 at 1). At this time, the monthly installments from November 2017 and forward were past due. There was an existing foreclosure action that had been initiated by Wells Fargo Bank, the previous owner of the loan.[4] (Tr. 6:10–19, 43:20–21, 46:1–11).

3. Rushmore's internal policy was to "suppress" credit reporting (i.e., withhold reporting credit activity to CRAs) for any account more than thirty days delinquent. (Tr. 44:6–14, 62:10–63:1, 74:21–75:5, 119:2–13). According to its policies, Rushmore would begin reporting to CRAs once the account was current. (Tr. 63:9–10, 103:15–22).

4. On May 15, 2020, Rushmore sent Tolliver a Borrower Assistance Application. (Tr. 7:18–22; PTX[5] pp.22–44). Tolliver completed and returned the Borrower

[3] Citations to the transcript of the trial (D.I. 133) are in the format "Tr. __."

[4] Tolliver's loan originated with Wachovia Mortgage, FSB. (PTX p.50). Wells Fargo Bank subsequently acquired Wachovia, and with it, Tolliver's loan. In November 2018, after the foreclosure action had been initiated, Wells Fargo Bank assigned its interest in the loan to U.S. Bank National Association as Legal Title Trustee for Truman 2016 SC6 Title Trust. (PTX p.14; *see Tolliver v. U.S. Bank Nat'l Trust Ass'n as Legal Title for Truman 2016 SC6 Title Trust*, 228 A.3d at 690 at ¶ 3 (Del. 2020)). Truman later sold its interest to Igloo Series IV Trust. (*See* DTX 5 at 1; DTX 6 at 1; D.I. 35 at ¶ 7). Fay Servicing acted as the servicer on Tolliver's loan until May 1, 2020, at which time Rushmore took over servicing of Tolliver's loan. (DTX 5 at 1).

[5] Plaintiff's Trial Exhibits were not separately marked. They were presented in one binder with pagination at the bottom of the page.

Assistance Application believing that it would qualify her to enter a loan modification agreement that would help her repay her overdue loan. (Tr. 8:1–21).

5. In June of 2020, Tolliver received notice that her Borrower Assistance Application was incomplete. (Tr. 9:1–3). Tolliver contacted Rushmore who then determined her Borrower Assistance Application was complete. (Tr. 9:4–11).

6. On July 10, 2020, Rushmore sent Tolliver an offer for a TPP. (Tr. 9:22–10:9). Tolliver was required to complete the TPP to become eligible for a potential loan modification. (DTX 8)

7. The TPP required Tolliver to make an initial payment of $7,462.88 by July 24, 2020, and six monthly payments of $975.54, with the first monthly payment due by August 1, 2020. (*Id.*).

8. Tolliver made the initial TPP payment of $7,462.88 on July 11, 2020. (PTX p.8; DTX 3 at 18). She made the monthly TPP payments of $975.54 on July 28, 2020, August 28, 2020, September 28, 2020, November 5, 2020, December 14, 2020, and January 25, 2021. (PTX pp.7–8; DTX 3 at 10–17).

9. Rushmore believed it did not, and legally could not, report Tolliver's TPP payments to CRAs. (Tr. 103:7–14; DTX 6 at 2; D.I. 111 at 2–3).

10. Per Rushmore's policies, payments of less than the full amount due for an installment period were held in a "suspense" account. (Tr. 103:7–14). Once a borrower had enough money in the suspense account to cover the oldest past due installment, Rushmore applied the payment from the suspense account to

that installment. (Tr. 104:17–105:12, 123:9–124:1). This action would move the borrower's account forward to the next installment period. (Tr. 105:8–12).

11. The TPP payments advanced Tolliver's account until the July 2019 installment period. (PTX p.7; DTX 3 at 10–17).

12. Rushmore's initial TPP offer required that Tolliver, after the TPP ended, to continue to make payments each month until a permanent modification agreement had been ratified by all parties. (DTX 8 at 1). Tolliver made two such payments of $975.54 on February 1, 2021, and March 1, 2021. (Tr. 11:22–23). Both payments were applied to Tolliver's suspense accounts. (PTX p.7).

13. Rushmore sent Tolliver the Modification Agreement in March of 2021. (Tr. 12:15–16).

14. Unhappy with the terms Rushmore offered in the Modification Agreement, Tolliver engaged Stephen Spence as legal counsel. (Tr. 12:7–14, 14:23–15:7). Between March and August, Spence communicated with Rushmore regarding the offer for the Modification Agreement. (Tr. 15:20–24; PTX pp.1–6). Tolliver did not make loan payments during this time. (DTX 3 at 8–9).

15. In August of 2021, Rushmore agreed to reissue the original offer for the Modification Agreement but with the additional condition that Tolliver pay the full amount that would have been due under the modified loan from April 2021, the first month a payment under the modified loan would have been due, through September 2021. (Tr. 15:20–24, 16:18; PTX p.6).

16. On September 8, 2021, Tolliver sent Rushmore the signed Modification Agreement and a payment totaling $6,071.16. (DTX 7). According to the terms

of the Modification Agreement and Tolliver's current balance, Tolliver was required to make monthly payments of $1,011.86. (Tr. 42:25–43:10; PTX p.6). The $6,071.16 payment represented the total unpaid amount due under the modified loan for the six months from April through September 2021. (Tr. 16:14–18).

17. A Senior Vice-President of Rushmore countersigned the Modification Agreement on September 23, 2021. (DTX 2 at 5).

18. Countersigning was one of many steps in Rushmore's process of "booking" a loan modification agreement. (Tr. 65:7–17, 68:13–20, 69:20–70:8, 72:7–73:4, 78:3–80:3, 119:14–22). It was Rushmore's policy that a modification was not finalized and applied to a customer's account until it was booked. (71:9–15, 120:21–121:18, 127:6–15, 130:24–131:5). At the time this Agreement was signed in September 2021, the full booking process typically took around 30–60 days to complete. (Tr. 65:18–25, 100:25–101:6).

19. On September 13, 2021, Rushmore placed the $6,071.16 payment into Tolliver's suspense account. (DTX 3 at 8). Rushmore marked the payment as received on September 9, 2021. (*Id.*).

20. It was Rushmore's policy to place payments made according to a modification agreement into the customer's suspense account until the modification was finalized, at which time, the payment could be applied according to the customer's modification agreement. (Tr. 103:7–14).

21. As part of the booking process, on September 24, 2021, Rushmore reactivated Tolliver's loan and advanced her account from the July 2019 installment to the

February 2021 installment. (Tr. 67:7–19; DTX 3 at 8). Between October 1 and October 7, 2021, Rushmore applied the $6,071.16 to past due installments, including the relevant late fees, in Tolliver's account. (*Id.* at 5–8). Rushmore retroactively applied the date of the payment to September 9, 2021. (*Id.*).

22. Rushmore booked Tolliver's Modification Agreement on October 7, 2021. (Tr. 76:22–14). Tolliver's account was then marked current through the September 2021 installment; there were no outstanding, past-due amounts. (DTX 3 at 5; Tr. 19:21–25).

23. Based on the effect of the Modification Agreement, the foreclosure status was removed from Tolliver's Rushmore account on September 24, 2021. (Tr. 44:1–3, 52:10–18, 110:2–4; DTX 5 at 1). The foreclosure judgment was vacated on September 24, 2021. (Tr. 52:14). A stipulation dismissing the foreclosure action was finalized sometime later in October 2021. (Tr. 52:15).

24. Tolliver filed a credit dispute with Transunion, a CRA that was reporting that the Rushmore loan was not current. (Tr. 20:2–24). Rushmore received from Transunion the ACDV form setting forth Tolliver's credit dispute on September 22, 2021. (Tr. 128:13–14; DTX 1 at 1). Rushmore sent the ACDV form to its credit reporting department for investigation. (Tr. 89:20–91:8). Rushmore returned the ACDV form to Transunion on September 30, 2021. (Tr. 128:14; DTX 1 at 1).

25. Rushmore's credit reporting department was able to see everything in a customer's internal account file. (Tr. 91:21–92:3). The internal account file would include payment history, internal transactions Rushmore made to a

customer's account, written communications between the customer and Rushmore, phone call history with notes on the conversations, loan documents, and internally made notes regarding the customer. (*Id.*).

26. By September 30, 2021, Tolliver's internal customer account file should have contained: the signed Modification Agreement, the active loan, her payment history, her suspense account balance, communications between Rushmore and Tolliver and/or her attorney, and any other internal notes related to her account. This should have included copies of multiple emails Tolliver sent to Rushmore disputing its credit reporting. (Tr. 92:4–93:25, 115:7–116:15; PTX pp.13–14, 50; *see* PTX p.50; DTX 5 at 1). The file should have also contained either copies or notes detailing the August through September 2021 communications between Rushmore and Tolliver's attorney regarding the Modification Agreement, the account status, and Tolliver's belief that Rushmore had been reporting improper information to CRAs. (Tr. 132:8–21).

27. Numerous documents in Tolliver's internal customer account file correctly included Plaintiff's name as "M. Denise Tolliver." (Tr. 95:20–23, 125:6–22; DTX 2 at 1, 5, 7, 8; DTX 3 at 1; DTX 7 at 1; DTX 8 at 1).

28. In its response to Transunion's ACDV form, Rushmore changed Tolliver's name to "Denise M. Tolliver" and changed her street address, reported that previous addresses listed on the ACDV form were unknown, and confirmed all other account information was correct. (Tr. 21:3–22:18; DTX 1 at 1).

29. Plaintiff did not prove that Rushmore's investigation caused her any financial damages. While Plaintiff discussed the thousands of dollars she spent on the

TPP payments and amount due as a condition to the Modification Agreement (Tr. 32:21–34:1), all of the money was applied to past due statements once the Modification Agreement was finalized. The money Tolliver spent to bring her loan payments current also occurred prior to Rushmore's investigation. Similarly, the default and foreclosure fees Plaintiff highlighted (Tr. 35:21–22, 36:13–14, 36:25–37:5) were a result of Plaintiff's failure to pay prior to entering the Modification Agreement, which occurred before Rushmore's investigation. Although Plaintiff asserted that Rushmore's mistake cost her thousands of dollars in lost opportunities to participate in refinancing programs (*E.g.*, D.I. 128 at 14 (refinance of auto loan in July 2021)), she did not prove that the programs existed in the short time between when the dispute was submitted to Transunion and when her account was updated, that she would have qualified for any of these programs if she had applied, or that the programs would have saved her money. (*See* Tr. 35:24–36:2, 37:12–20).

30. Plaintiff did not prove that Rushmore's investigation resulted in emotional damages. Tolliver's testimony on emotional distress focused on the impact of Rushmore's servicing of her loan generally, the frustration of the Modification Agreement not being booked until after the September statement date, and the threat of foreclosure proceedings stemming from the existing foreclosure action. (Tr. 35:12–19, 36:19–37:5, 37:21–25). All these examples occurred before Rushmore's investigation.

**C. Conclusions of Law**

The parties do not dispute that (1) Tolliver filed a dispute with a CRA and (2) the CRA notified Rushmore, as the furnisher of the disputed information, of Tolliver's dispute. Thus, Tolliver has met the first two elements of a 15 U.S.C. § 1681s-2(b)(1) violation. Rushmore argues that (1) it could not report Tolliver's loan account as current until the Modification Agreement was finalized, and (2) Tolliver cannot show that Rushmore failed to investigate her September 2021 Transunion dispute. (D.I. 128 at 5). To meet the third element, Tolliver must (1) make a prima facie case showing that Rushmore provided incomplete or inaccurate information to Transunion, and (2) show that the incomplete or inaccurate information was a result of an unreasonable investigation. *Ritz*, 2025 WL 1303945, at *3.

**1. Violations of 15 U.S.C. § 1681s-2(b)(1).**

Tolliver identified multiple pieces of information that she believes Rushmore reported incompletely or inaccurately.

**a. Name**

Tolliver argued that Rushmore incorrectly reported her name as "Denise M. Tolliver" in its response on the ACDV form. (Tr. 19:5–18). In my summary judgment opinion, I explained that Plaintiff did not properly raise the alleged mistake in her name. (D.I. 111 at 2 n.2). Thus, I do not consider whether Rushmore violated 15 U.S.C. § 1681s-2(b)(1) by incorrectly reporting Tolliver's name. However, I do consider the evidence related to Tolliver's name as part of the broader question of whether Rushmore's investigation was reasonable.

To support her claim that Rushmore incorrectly changed her name in its response on the ACDV form, Tolliver testified that her legal name is "M. Denise Tolliver" (Tr. 21:10–12), she pointed to the "request data" column on the ACDV form which stated her name as "M. Denise Tolliver" (DTX 1), and she identified multiple documents, including the notarized Modification

Agreement (DTX 2), that included her name as "M. Denise Tolliver." Rushmore's change represents a clear factual inaccuracy.

Rushmore responded that its obligation in responding to ACDV forms is to correct the information to reflect what its records show. (Tr. 94:25–95:1, 122:7–20). As such, Rushmore argued that the reported name change would have been made to reflect its internal records.

Setting aside the legal question of whether Rushmore was obligated to report the information its records contained or the factually correct information, the evidence does not support Rushmore's argument that its internal system listed her name as "Denise M. Tolliver." This evidence includes:

- Typed portions of the Modification Agreement, created by Rushmore, that used the name "M. Denise Tolliver" multiple times. (DTX 2 at 1, 5, 7, 8).
- Documents that were automatically created by Rushmore's internal system before Rushmore's ACDV form response that contained the correct name. (DTX 3 at 1; DTX 8 at 1; PTX p.22).
- Letters sent by Rushmore prior to the ACDV form response that used the correct name. (PTX pp.9, 11, 21, 50).
- Correspondence from Tolliver and her attorney listed her name as "M. Denise Tolliver." (DTX 7 at 1; PTX pp.1, 13). This correspondence would have been contained in her customer file. (Tr. 91:9–3, 96:12–23).

Thus, Rushmore reported inaccurate information.

Whether the mistake in her name was a result of an unreasonable investigation depends on the investigational procedure used, the balance of inaccuracy with costs of investigating, and the content of the inaccuracy notice. *Seamans*, 744 F.3d at 864–65. Every piece of evidence showed

that Rushmore had Tolliver's correct name in its internal customer file; Rushmore did not identify any evidence showing that its file listed her name as "Denise M. Tolliver." (*See* Tr. 125:1–126:4). This indicates that Rushmore's procedures did not prioritize a detail-focused or complete investigation. The balance of harms and costs also weighs in favor of Tolliver. While swapping a customer's first and middle names likely does not create great harm to the consumer, ensuring that a consumer's name is correct requires almost zero additional effort for Rushmore. Rushmore did not offer any explanation or evidence explaining why this mistake could be made in a reasonable investigation.

Therefore, although not a violation of the FCRA itself, Rushmore's incorrect reporting of Tolliver's name is evidence of a generally unreasonable investigation.

**b. Address**

According to Tolliver's testimony, the address that Transunion had initially included on the ACDV form was her correct mailing address. (Tr. 21:19–22:18). Tolliver argued that Rushmore incorrectly changed her address by (1) switching her mailing address to the mortgaged property's address, and (2) omitting the apartment number on the address Rushmore included. (Tr. 21:19–22:18). Rushmore did not explain why it changed Tolliver's address. In my summary judgment opinion, I explained that Plaintiff did not properly raise the alleged address mistake. (D.I. 111 at 2 n.2). Thus, I do not consider whether Rushmore violated 15 U.S.C. § 1681s-2(b)(1) by incorrectly reporting Tolliver's address. However, I do consider evidence related to Tolliver's address as part of the broader question of whether Rushmore's investigation was reasonable.

Neither party has argued or supplied any relevant authority that the address section of the ACDV form had any specific legal meaning, i.e., whether it referred to the mailing address of the consumer, the residential address of the consumer, or the address of the property subject to the

mortgage. Therefore, Tolliver did not meet her burden of showing that changing the address from her mailing address to her residential address was "inaccurate." However, omitting the apartment number could indicate "incomplete" reporting. The Modification Agreement lists Tolliver's address with an apartment number (DTX 2), and communications from Rushmore included the apartment number on the property address (PTX p.9). Rushmore did not identify any instance in its records which the address was listed without the apartment number.

Whether the omission of the apartment number was based on an unreasonable investigation follows the same set of considerations as discussed above. *See Seamans*, 744 F.3d at 864–65. Omitting an apartment number is a small mistake to make; however, it is the kind of mistake that indicates poor attention to detail. Similarly, this mistake is not the type that will likely cause great harm to a consumer; however, preventing the mistake altogether would cost Rushmore no additional resources. Rushmore did not attempt to explain how this mistake was made or why the mistake is consistent with a reasonable investigation.[6] Therefore, while not a violation of the FCRA itself, Rushmore's omission of Tolliver's apartment number serves as a small piece of evidence in support of a lack of care in the investigation.

**c. Account Status**

Tolliver argued that Rushmore inaccurately reported her account status as 120–149 days past the due date despite her September 8, 2021, payment that covered all overdue amounts. Rushmore presented evidence that the September 8 payment was a part of the Modification Agreement and not applied to her account until after the Modification Agreement was finalized.

---

[6] Tolliver's dispute to Transunion did not provide Rushmore notice that her address was incorrect. However, Rushmore independently chose to change Tolliver's address in its response to the ACDV form. (*See* DTX 1 at 1). Rushmore's decision to update this information without notice does not absolve it of the duty to accurately report the information.

(DTX 3). Rushmore's evidence demonstrated that it had a long process to accept and implement a loan modification agreement; these steps included applying a lump sum payment to a customer's account and moving the funds around as necessary. (Tr. 65:7–17, 68:13–20, 69:20–70:8, 72:7–73:4, 78:3–80:3, 119:14–22). Rushmore did not sign the Modification Agreement until September 23 (DTX 2 at 5), and the movement of funds in Tolliver's Rushmore account was not finalized until October 7, 2021 (DTX 3 at 5–7). Evidence clearly demonstrates that the September 8 payment was applied to Tolliver's account at various times between October 1 and 7 (*id.*); the fact that Rushmore retroactively applied the payment to Tolliver's account in early September does not change that the payment was not processed and applied until October 2021.

Tolliver has not met her burden of showing that Rushmore's reporting of her account status was incorrect at the time of Rushmore's reporting.

**d. Foreclosure**

Tolliver argued that Rushmore reported that her mortgage was in foreclosure despite foreclosure proceedings ending more than a year before Rushmore returned the ACDV form. Tolliver initially testified that the foreclosure action ended before Rushmore began servicing the loan. (Tr. 23:2–8). However, Tolliver later conceded that the foreclosure action was only finally resolved in conjunction with the implementation of the Modification Agreement. (Tr. 31:2–6, 52:10–19). Rushmore argued that it had not reported the foreclosure itself, and because the foreclosure action was initiated by a third party, it did not have the ability to amend any foreclosures reported by a previous loan servicer or owner. (Tr. 43:20–44:14, 45:25–46:11, 52:10–17, 109:15–110:14; DTX 5 at 1; DTX 6 at 1).

It was undisputed that the foreclosure judgment was vacated on September 24, 2021. (Tr. 52:14). However, there was undisputed evidence that the stipulation dismissing the foreclosure

action was not filed until sometime later in October 2021. (Tr. 52:15). While Rushmore claimed the "account has been removed from foreclosure with the modification processed on the account on September 24, 2021," (Tr. 44:1–3; 110:2–4; DTX 5 at 1), there was no explanation of what this means or how it impacts Rushmore's reporting. Tolliver has not shown that Rushmore had an obligation to report her account without the foreclosure proceeding prior to the stipulation dismissing the foreclosure action, particularly as the ACDV form states that "foreclosure proceedings [had] started." (DTX 1 at 2). Thus, Tolliver has not made a prima facie case that the foreclosure action was improperly reported.

**e. Term Duration and Term Frequency**

Tolliver argued that Rushmore reported her term duration and term frequency in months rather than in years. (Tr. 23:12–24). Tolliver did not provide any evidence to indicate why this reporting was inaccurate. Thus, Tolliver has failed to present a prima facie case that the term duration and term frequency for her mortgage were inaccurate.

**f. Date of Last Payment**

Tolliver argued that Rushmore's ACDV form response indicating that the date of her last payment was September 28, 2020, was factually inaccurate because she had made multiple payments after the reported date. (Tr. 23:18–24, 95:5–9, 105:23–107:4). Rushmore responded by arguing that it had not reported any payments for her account. (Tr. 62:10–63:13, 103:15–104:15, 110:8–21; DTX 6 at 1–2).

Tolliver's payment history indicates that she made payments in July, August, September, November, and December of 2020, and in January, February, and March of 2021. (PTX pp.7–8; DTX 3 at 10–18). As decided on summary judgment, Rushmore was not obligated to report any TPP payments to CRAs. (D.I. 111 at 1–2). Nevertheless, Rushmore reported in its ACDV form

response to Transunion the September 28, 2020, payment, which was a TPP payment. (DTX 8). Further, Rushmore did not report the February and March 2021 payments that were made after the TPP was completed. (*Id.*). Those two payments were not TPP payments. Thus, Rushmore reported a TPP payment as the last payment and did not report two later non-TPP payments as the last payment. Rushmore's only explanation for these issues was that it had not reported any information on Tolliver's loan prior to the Modification Agreement, and that Transunion may have received this information from a third-party source. (Tr. 88:25–89:5, 112:21–113:11). This explanation attempts to avoid liability and shift responsibility. In responding to the ACDV form, Rushmore had a duty to correct any inaccurate information. By failing to correct the last payment date, Rushmore confirmed that Tolliver's last payment was in September 2020. Rushmore did not offer any other factual or legal explanations.[7] Thus, Tolliver has made a prima facie showing that Rushmore reported an inaccurate date of last payment.[8] The question now turns to whether this inaccuracy was a result of an unreasonable investigation.

According to Mr. George's testimony, investigators were supposed to review payment history to confirm information such as date of last payment. (Tr. 91:4–17, 107:14–19). While this indicates that Rushmore had policies aimed at completing a thorough investigation, Tolliver's account history (DTX 3) introduced by Rushmore shows that the investigator either did not fully

---

[7] Even if none of the pre-Modification payments should have been reported because the account was dormant, keeping the September 2020 payment listed as the date of last payment "creates a materially misleading impression" that qualifies as incomplete or inaccurate. *Seamans*, 744 F.3d at 865 (internal quotation omitted).

[8] The parties did not argue what Rushmore should have reported. All that has been established is that (1) Rushmore was not supposed to report TPP payments, (2) Rushmore reported a TPP payment by confirming the payment in its response to the ACDV form, and (3) Rushmore did not report the two post-TPP, pre-Modification Agreement payments. It is not clear what Rushmore should have reported, but the evidence shows that Rushmore's reporting was legally and factually inaccurate.

review Tolliver's history or did not correct the inaccurate information on the ACDV form. (*See id.* at 10–18). Ensuring that the reported date of last payment conforms with the internal payment record does not create much of a burden on Rushmore at all; on the other hand, the burden of incorrect reporting has the potential for significant harm to the consumer. A reasonable investigation of Tolliver's payment history—and the impact any TPP or Modification Agreement documents may have had on Rushmore's reporting—should have been more thorough than it was since Rushmore received multiple forms of notice that the dispute was related to payment history. *See Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005); *Krajewski v. Am. Honda Fin. Corp.*, 557 F. Supp. 2d 596, 610 (E.D. Pa. 2008). The ACDV form explicitly stated that Tolliver disputed the account status and payment rating—factors that relate to when payments were made. (DTX 1 at 1). Tolliver had previously put Rushmore on notice by sending emails explaining her dispute with how Rushmore was reporting her payment history (PTX at pp.1, 13–14).

Rushmore did not provide any meaningful explanation for how this mistake arose in a reasonable investigation. As addressed above, its argument that it could not report TPP payments is contradicted by its own actions; the reported September payment was a TPP payment. Even if this served as an explanation, Tolliver's later unreported payments were not TPP payments. Similarly, Rushmore's argument that it reported the account as dormant and did not report any account updates is misleading; by confirming the September payment, Rushmore reported September 28, 2020, as the last payment date.

Rushmore received notice that Tolliver disputed the way it was reporting her payment history. Despite this, Rushmore failed to spend the minimal amount of time necessary to review

her payment history to ensure its reporting complied with guidelines for reporting both TPP and non-TPP, pre-modification payments. This mistake was a result of an unreasonable investigation.

**g. Balance and Balloon Payment Information**

Tolliver argued that the balance amount and balloon payment information reported on the ACDV form were inaccurate based on the changes brought by the Modification Agreement. (Tr. 25:7–11). Rushmore argued that it did not report this information at all until the Modification Agreement was finalized. (Tr. 96:13–98:14, 120:21–121:18). As already addressed, evidence showed that the loan was not modified until October 7. Thus, Tolliver has failed to make a prima facie case showing that Rushmore reported inaccurate loan balance and balloon payment information.

**2. Damages**

I have found one violation of 15 U.S.C. § 1681s-2(b)(1).

Damages for a violation are guided by 15 U.S.C. §§ 1681n & 1681o. Section "1681o authorizes consumers to bring an action for actual damages, costs, and attorney's fees. If the failure to comply is willful, § 1681n further provides for statutory and punitive damages." *Kirtz v. Trans Union LLC*, 46 F.4th 159, 162 (3d Cir. 2022). In this case, there was no evidence presented that any of Rushmore's reporting mistakes—Tolliver's name, her address, and the date of last payment—were anything more than negligent.[9] Thus, damages in this case are guided only by §1681o.

Section 1681o permits two types of damages: (1) "actual damages sustained by the consumer as a result of the failure," and (2) "in the case of any successful action to enforce any

[9] The change of name from "M. Denise Tolliver" to "Denise M. Tolliver" indicates some attempt to comply with Rushmore's duties. It is hard to imagine anything other than a misunderstanding of something in the file as the reason for that mistake.

liability under this section, the costs of the action together with reasonable attorney's fees." 15 U.S.C. § 1681o(a). This section does not authorize punitive damages or statutory damages.[10] Thus, Tolliver's request for punitive damages is denied.

**a. Actual Damages**

Tolliver identified four sets of actual damages that she argued were sustained as a result of Rushmore's violation of the FCRA. (D.I. 128 at 17). "A plaintiff cannot obtain an award of 'actual damages' under the FCRA without establishing a causal relationship between a statutory violation and the harm for which redress is sought." *Gagliardi v. Equifax Info. Servs., LLC*, 2011 WL 337331, at *12 (W.D. Pa. Feb. 3, 2011). It is "sufficient that, as with most other tort actions, a FCRA plaintiff produce evidence from which a reasonable trier of fact could infer that the inaccurate entry was a 'substantial factor' that brought about the [injury]." *Philbin*, 101 F.3d at 968.

Tolliver's claims for actual damages are hamstrung by two things. The first is that Rushmore's FCRA violation occurred on September 23, 2021, and was corrected by the end of October 2021. That is a short period of time. The second is that her testimony related to damages focused not on that time period, but on the time period preceding September 23, 2021. It is a matter of logic that what occurred on September 23, 2021, cannot be the cause of events occurring before that date.

First, Tolliver requests $15,267 for the TPP funds held in suspense. (D.I. 128 at 17). However, she did not show that this amount exists in her suspense account either now or at the

[10] After closing arguments, for the first time, the parties disputed whether statutory damages are available in this case. (Tr. 147:2–148:21). To properly address this dispute, I instructed the parties to submit letters detailing the availability of statutory damages. (Tr. 157:14–18). Upon reviewing the parties' letters (D.I. 129; D.I. 131), it is clear that Section 1681o—the only applicable section of the FCRA addressing damages—does not authorize statutory damages.

time of the improper reporting. To the contrary, evidence presented at trial showed that the entire balance of Tolliver's suspense account was applied to her loan during the process of booking the Modification Agreement. (*See* DTX 3 at 5–8). Further, Tolliver did not attempt to show that this amount was in her suspense account as a result of Rushmore's improper reporting. Thus, Tolliver's request for $15,267 in damages related to her suspense account is denied.

Second, Tolliver seeks $109,286 in damages representing the account balance on her loan as of March 2026.[11] (D.I. 128 at 17). Beyond failing to prove what her account balance currently is, Tolliver has not presented any argument for why she would be entitled to the full amount of her loan balance. The relevant portions of the FCRA do not authorize the discharge of the remaining loan balance after a loan servicer is found to have violated the reporting requirements. Nor has Tolliver demonstrated that the loan balance is related to Rushmore's misreporting. Therefore, Tolliver's request for damages for the amount remaining on her loan is denied.

Third, Tolliver requests $2,513 to cover the amount lost after the refinancing application for her car loan was denied. (*Id.*). Tolliver did not present any evidence to verify this amount. Even if she had, Tolliver has stated that the refinancing was denied on July 18, 2021. (*Id.* at 15). This was before Rushmore's unreasonable investigation and, therefore, is not a loss "as a result of the failure." 15 U.S.C. § 1681o(a)(1). Tolliver's request for damages resulting from the denial of refinancing her car loan is denied.

Fourth, Tolliver seeks $147,000 for emotional distress. (D.I. 128 at 17). At trial, Tolliver testified that she suffered emotional distress from the threat of losing her home to foreclosure, the

---

[11] Tolliver makes the same request for the balance of her loan and the TPP funds held in suspense as an argument for disgorgement. (D.I. 128 at 18). Her request for disgorgement is denied for the same reasons as addressed here; Tolliver has not proven the balance of her loan or TPP account, that either amount is a result of Rushmore's FCRA violation, or that damages in this form are authorized by the FCRA.

stress of receiving notices of late payments and additional fees, and the emotional impact of being unable to benefit from pandemic related refinancing opportunities on her existing loans. (Tr. 35:12–37:25). Tolliver has not shown that any of the emotional harm was a result of Rushmore's reporting violation. The notices of late payment and additional fees were sent before Rushmore's FCRA violation. Similarly, the denial of her car loan and disqualification from pandemic mortgage refinancing occurred before Rushmore's improper reporting. While the foreclosure action was still looming at the time of Rushmore's violation, Tolliver did not present sufficient evidence to show that Rushmore had the ability or obligation to remove the foreclosure proceeding in its response to the ACDV. Therefore, Tolliver has not shown she is entitled to any damages for emotional harm as a result of Rushmore's FCRA violation.

In short, Tolliver failed to prove any actual damages.

**b. Attorney's Fees and Costs**

Tolliver seeks damages to cover attorney's fees and litigation costs; her request includes fees for two separate attorneys and costs incurred while proceeding pro se. (D.I. 128 at 17). Section 1681o allows attorney's fees in the case of a "successful action to enforce any liability under this section." 15 U.S.C. § 1681o(a)(2). Although the Third Circuit has not weighed in, other courts have determined that "to be 'successful' the plaintiff must receive some relief beyond mere entry of judgment." *Nagle v. Experian Info. Sols., Inc.*, 297 F.3d 1305, 1306 (11th Cir. 2002); *see Crabill v. Trans Union, L.L.C.*, 259 F.3d 662, 666–67 (7th Cir. 2001). This generally has required that the plaintiff be awarded actual damages for violation of the statute. *Nagle*, 297 F.3d at 1306–07; *Crabill*, 259 F.3d at 666–67.

The Second Circuit has held, "The term 'actual damages' may include out-of-pocket expenses for attorney's fees incurred by a plaintiff prior to litigation of his FCRA claims." *Casella*

*v. Equifax Credit Info. Servs.*, 56 F.3d 469, 474 (2d Cir. 1995). However, "expenses incurred merely to notify appellees of inaccurate credit information, and not to force their compliance with any specific provision of the statute, cannot be compensable as 'actual damages' for a violation of the FCRA." *Id.* I assume the Second Circuit correctly states the law. That assumption does not help Tolliver because she did not offer any evidence at trial related to her pre-FCRA litigation attorney's fees (i.e., Steve Spence's fees). Tolliver failed to prove any actual damages.

Thus, because Tolliver has not shown she is entitled to any actual damages, her request for attorney's fees and costs is denied.

**c. Injunctive Relief**

Tolliver seeks three forms of injunctive relief. (D.I. 128 at 18). First, Tolliver asks for the Rushmore and Nation Star tradelines to be removed from credit bureaus. (*Id.*). Second, Tolliver requests permission to publish all information regarding this lawsuit on any media platform.[12] (*Id.*). Third, she seeks a permanent modification of her mortgage to match the interest rates and overall balance that she would have had if she had qualified for refinancing under the CARES Act. (*Id.*).

Tolliver has not identified anywhere in the FCRA, or elsewhere, that enables her to receive injunctive relief. While the Third Circuit has not ruled on whether injunctive relief is available under the FCRA, it has held that "injunctive and declaratory relief are not available to litigants acting in an individual capacity under the FDCPA," which contains a similarly worded damages provision as the FCRA. *Weiss v. Regal Collections*, 385 F.3d 337, 342 (3d Cir. 2004), *abrogated*

---

[12] There are only two documents in this case that have been filed under seal. (*See* D.I. 90; D.I. 108). Beyond the restrictions related to these documents, the case is already publicly available.

*on other grounds by Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016). Other courts, including those within the Third Circuit, have determined that:

> the absence of any express provision for injunctive relief in Sections 1681n and 1681o, coupled with the express authorization of such relief on behalf of federal and state agencies, leads to the unmistakable conclusion that Congress intended to limit injunctive relief to those instances in which it expressly authorized it.

*White v. First Am. Registry, Inc.*, 378 F. Supp. 2d 419, 424 (S.D.N.Y. 2005); *see Hamer v. Navient Corp.*, 2018 WL 4026729, at *5 (D. Del. Aug. 23, 2018); *Carlton v. Choicepoint, Inc.*, 2009 WL 412754, at *6 (D.N.J. Nov. 23, 2009); *see also Washington v. CSC Credit Servs.*, 199 F.3d 263, 268 (5th Cir. 2000); *Owoyemi v. Credit Corp Sols.*, 596 F. Supp. 3d 514, 519 (S.D.N.Y. 2022); *Domonoske v. Bank of Am.*, 705 F. Supp. 2d 515, 518–19 (W.D. Va. 2010); *Jarret v. Bank of Am.*, 421 F. Supp. 2d 1350, 1354–55 (D. Kan. 2006); *Jones v. Sonic Auto., Inc.*, 391 F. Supp. 2d 1064, 1066 (M.D. Ala. 2005); *Mangio v. Equifax, Inc.*, 887 F. Supp. 283, 285 (S.D. Fla. 1995). I see no reason to find otherwise.

Thus, Tolliver's request for injunctive relief is denied.

## III. CONCLUSION

For the foregoing reasons, I find that Tolliver has proven that, as a result on an unreasonable investigation, Rushmore reported to Transunion incomplete or inaccurate information regarding Tolliver's name, address, and date of last payment. The reporting of the last of those three is a violation of 15 U.S.C. § 1681s-2(b)(1). However, Tolliver has not shown that she suffered any actual damages as a result of this violation. Nor has she shown that Rushmore's actions warrant punitive damages. Without actual or punitive damages, Tolliver is not entitled to attorney's fees. I will enter a separate final judgment giving effect to my conclusion in this opinion.